**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-20063** |
| **SQLC SENIOR LIVING CENTER AT** | § | |
| **CORPUS CHRISTI, INC. d/b/a** | § | **CHAPTER 11** |
| **MIRADOR** | § | |
| | § | |
| Debtor. | § | |

**DECLARATION OF LOUIS E. ROBICHAUX IV IN SUPPORT OF VOLUNTARY
PETITION AND FIRST DAY MOTIONS**

I, Louis E. Robichaux IV, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.       My name is Louis E. Robichaux IV ("Robichaux").  I am the Chief Restructuring Officer of SQLC Senior Living Center at Corpus Christi, Inc. d/b/a Mirador ("Mirador" or the "Debtor").  I have held this position since October 1, 2018.  My business address and telephone number are as follows:

> Ankura Consulting Group, LLC
> Attn: Louis E. Robichaux IV, Senior Managing Director
> 15950 Dallas Parkway, Suite 750
> Dallas, TX 75248
> Telephone: (214)200-3689

2.       I submit this Declaration based on personal knowledge in support of (a) the voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by the Debtor on February 8, 2019 (the "Petition Date"); and (b) the following notice and motions (collectively, the "First Day Motions"):

A.       NOTICE OF DESIGNATION AS COMPLEX CHAPTER 11 CASE;

B.       EMERGENCY MOTION TO APPROVE (A) MAINTENANCE OF CERTAIN PRE-PETITION BANK ACCOUNTS AND CASH

MANAGEMENT SYSTEM; AND (B) CONTINUED USE OF EXISTING CHECKS AND BUSINESS FORMS;

C.  EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF;

D.  EMERGENCY MOTION FOR (A) ENTRY OF AN ORDER APPROVING (1) THE ASSET PURCHASE AGREEMENT AND AUTHORIZING THE DEBTOR TO ENTER INTO THE ASSET PURCHASE AGREEMENT AND COMPLY WITH ITS OBLIGATIONS THEREUNDER; (2) RELATED BID PROTECTIONS; (3) THE PROCEDURES FOR THE SOLICITATION OF HIGHER OR BETTER OFFERS; (4) THE FORM AND MANNER OF NOTICE; (5) THE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (B) ENTRY OF AN ORDER APPROVING (1) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (2) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND UNEXPIRED LEASES;

E.  EMERGENCY MOTION TO (A) APPROVE (1) PRE-PETITION WAGES, SALARIES AND PAYROLL TAXES; (2) TO REIMBURSE EMPLOYEES FOR PRE-PETITION BUSINESS EXPENSES; AND (B) TO HONOR EXISTING BENEFIT PLANS AND POLICIES AT THEIR DISCRETION IN THE ORDINARY COURSE OF BUSINESS;

F.  EMERGENCY MOTION TO AUTHORIZE (A) LIABILITY, PROPERTY, AND OTHER INSURANCE PROGRAMS, (B) PAYMENT OF ALL OBLIGATIONS IN RESPECT THEREOF, AND (C) THE ABILITY TO ENTER INTO PREMIUM FINANCING AGREEMENTS IN THE ORDINARY COURSE OF BUSINESS.

G.  EMERGENCY MOTION TO (A) AUTHORIZE THE DEBTOR TO MAKE ADEQUATE ASSURANCE OF PAYMENTS TO UTILITIES; (B) PROHIBIT UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES; AND (C) ESTABLISH PROCEDURES FOR RESOLVING REQUESTS FOR ADDITIONAL ASSURANCE OF PAYMENT;

H.  EMERGENCY MOTION FOR ORDER AUTHORIZING THE DEBTOR TO PAY PRE-PETITION SALES, USE, AND OTHER TAXES AND RELATED OBLIGATIONS;

I.     EMERGENCY MOTION UNDER 11 U.S.C. § 333 TO EXCUSE APPOINTMENT OF A PATIENT CARE OMBUDSMAN;

J.     APPLICATION TO APPROVE AGREEMENT WITH EPIQ CORPORATE RESTRUCTURING, LLC AND APPOINT EPIC CORPORATE RESTRUCTURING, LLC AS CLAIMS, NOTICING, SOLICITING AND BALLOTING AGENT;

K.     EMERGENCY MOTION TO ESTABLISH DEADLINES FOR FILING PROOFS OF CLAIM AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF;

L.     EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO (A) MAINTAIN, ADMINISTER, AND MODIFY MEDICAL PAYMENT REFUND PROGRAMS AND PRACTICES; AND (B) HONOR OBLIGATIONS RELATED THERETO;

M.     MOTION FOR ORDER EXCUSING CERTAIN RESIDENTS FROM FILING PROOFS OF CLAIM WITH RESPECT TO ENTRANCE FEES;

N.     EMERGENCY MOTION FOR AN ORDER AUTHORIZING THE DEBTOR TO (I) ESCROW POST-PETITION ENTRANCE FEES AND (II) REFUND CERTAIN ENTRANCE FEES; and

O.     EMERGENCY MOTION TO (A) PERMIT FILING OF CREDITOR MATRIX; (B) IMPLEMENT CERTAIN NOTICE PROCEDURES AND (C) IMPLEMENT PROCEDURES TO MAINTAIN AND PROTECT RESIDENT INFORMATION.

3.     I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "Case").

4.     The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively.  I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of this Case.

5.      Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon

---

experience, knowledge, and information concerning the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

<u>**RELEVANT FACTUAL BACKGROUND**</u>

**A.      Overview of the Debtor's Business**

6.      Mirador, a Texas nonprofit corporation owns and operates a 228-unit continuing care retirement community ("<u>CCRC</u>") comprised of 271,455 square feet of developed property on approximately 17 acres of land (the "<u>Facility</u>") which opened in June 2011.  As of January 1, 2019, the Debtor employs 183 employees (the "<u>Employees</u>").  Mirador offers seniors a full continuum of care in one centralized campus-style setting throughout the aging process.

Below is a picture of the Facility.



7.     Upon entering the CCRC, residents (each a "<u>Resident</u>," and collectively the "<u>Residents</u>") are provided spacious apartment homes and a broad range of social and recreational activities.  As Residents enter their later years and require additional assistance with everyday activities or health care services, they have access to assisted living, memory support, skilled nursing facilities, and rehabilitation services all located on the Facility.  Additionally, Mirador provides its Residents with multiple entertainment outlets and other social benefits.  Mirador's amenities are designed to address all aspects of a Resident's life, including the following: living unit, main and private dining rooms, fitness center, business center/library, beauty salon/barber shop, club room, creative arts center, residential storage, and a mail alcove.  Simply put, the Residents entrust their health, safety, and well-being to Mirador for the duration of their lives. Below are pictures of some of the Facility's amenities.

Below is a picture of the Facility's club room.



Below is a picture of the Facility's pool and hot tub.



Below is a picture of one of the Facility's dining rooms.



Below is a picture of one of the Resident units.



8.      For many seniors, joining a CCRC is an attractive option for them and their families because it helps minimize the burdens and costs associated with the aging process. These seniors will often sell their homes or liquidate significant assets, including their life savings, in order to become a part of a CCRC, like Mirador

9.      CCRCs, however, are often operationally and financially complex.  Specifically, CCRCs can be challenging to operate because they require the maintenance of a broad range of services to seniors in varying stages of the aging process.  Additionally, CCRCs require a steady flow of new residents in order to maintain day-to-day operations and to remain current on financial obligations, including, most importantly, obligations to current and former residents.

10.     As will be described in greater detail below, Mirador relies on revenue generated by New Residents (defined below) to, among other things, maintain its day-to-day operations, meet its debt obligations and comply with its resident refund obligations.  Recently, the highly competitive local senior living market has impacted Mirador's ability to generate sufficient net cash flow to cover all of its expenses. Because of these challenges, Mirador has been unable to pay

its debts as they become due and, as discussed in greater detail below, defaulted on significant obligations.

11.     Further, Mirador has received a determination letter from the Internal Revenue Service setting forth its determination that Mirador is exempt from federal income taxation under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3) of the Internal Revenue Code.

**B.     Corporate Governance and Facility Oversight**

12.     Senior Quality Lifestyles Corporation ("SQLC") is the Debtor's sole member.  In addition to being a tax-exempt entity as a charitable organization described in section 501(c)(3) of the Internal Revenue Code, SQLC is also a Texas nonprofit corporation.  An organizational chart is attached hereto as **Exhibit A**.

13.     SQLC is also the sole member of the following nonprofit CCRCs, which are each financially separate: (a) Northwest Senior Housing Corporation d/b/a Edgemere; (b) Buckingham Senior Living Community, Inc. d/b/a The Buckingham; (c) Barton Creek Senior Living Center, Inc. d/b/a Querencia at Barton Creek; (d) Tarrant County Senior Living Center, Inc. d/b/a The Stayton at Museum Way; and (e) Mayflower Communities, Inc. d/b/a The Barrington of Carmel (collectively with Mirador, the "SQLC Communities").  SQLC acts as a supporting organization for the SQLC Communities, providing oversight, direction, and governance support, and may make grants and/or provide other forms of financial assistance.

14.     Further, SQLC is the sole member of SQLC LSA, LLC, a Texas limited liability company ("SQLC LSA").  SQLC LSA was established to provide financial support in conjunction with the tax-exempt bond financings for the acquisition, construction, and equipping of the CCRCs owned and operated by the Debtor and certain other SQLC Communities.

15.     Additionally, SQLC is the sole owner of Seniority, Inc., a California corporation ("Seniority"), that provides senior living marketing, management, and development consulting services.  In June 2017, SQLC acquired sole ownership of Seniority, and Seniority began providing management services to Mirador in July 2017 under the oversight of the Debtor and SQLC.  SQLC and Mirador are governed by separate boards of directors.  Due to overlap of some members of the SQLC and Mirador boards of directors, an independent director (retired Judge Richard S. Schmidt) was appointed to the Mirador board of directors who participated in and approved all pre-bankruptcy board decisions.

16.     The Debtor is a party to that certain Administration and Operational Oversight Agreement, effected January 1, 2010 (the "SQLC Oversight Agreement") with SQLC.  As part of the SQLC Oversight Agreement, SQLC provides administrative and operational oversight to Mirador.  In return, SQLC is reimbursed for the administrative and operational oversight services provided.  Mirador's allocated overhead share is computed based on the proportion the total number of units in the Facility against the aggregate number of units among all of the SQLC Communities.  Due to the provisions of the SQLC Oversight Agreement, which provides for the deferral of the Debtor's allocated share of overhead during its start-up phase and when certain events of default under the Bond Documents have occurred and are continuing or when payment of the allocated share of overhead may cause the Debtor to incur such events of default, the allocated share of overhead due to SQLC has been deferred and accrued each year.  As of the Petition Date, the accrued and unpaid oversight fees are approximately $2 million.

17.     SQLC is a party to that certain Master Management Services Agreement, dated September 7, 2017 (the "Master Services Agreement") with Seniority.[1]  The Master Services

---

[1] All of the SQLC communities, except Mirador, have entered into separate addenda to the Master Services Agreement setting forth the terms under which Seniority will provide management services to each of those SQLC communities.

Agreement provides that Seniority will serve as the day-to-day manager of the SQLC Communities. Pursuant to the terms of the Master Services Agreement, Seniority is required to provide all management services necessary to operate the Facility, including but not limited to, financial management, purchasing, marketing, recruitment of personnel, and supervision of the operations and programs of Mirador. Seniority is paid a monthly management fee (the "Management Fee") and overhead fee (the "Overhead Fee"). The Management Fee is calculated as six percent (6%) of the sum of monthly Revenues (as defined in the Master Services Agreement), generally consisting of net patient service revenues and net resident service revenues, other operating revenues and net Entrance Fees (defined below). The Overhead Fee is calculated as three percent (3%) of the Management Fee. Seniority also receives reimbursement for the salary and benefits of the Executive Director and for reasonable travel expenses incurred in the performance of management services for Mirador. The Executive Director of Mirador is an employee of Seniority and not of the Debtor. Due to an agreement among Seniority, Mirador, and the Indenture Trustee, 90% of the Management Fee and Overhead Fee owed by the Debtor to Seniority for the months of March 2018 through October 2018 was deferred and unpaid. As of the Petition Date, approximately $484,000 is accrued and unpaid pursuant to the Master Services Agreement.

**C.     The Debtor's Assets and Operations**

18.     Mirador's revenue is derived solely from operation of the Facility. The Debtor offers a variety of residence options for its Residents, including the following:

> (a) 125 Independent Living residences ("Independent Living"): Independent Living offers two (2) one-bedroom floor plan options ranging from 756 – 851 square feet and three (3) two-bedrooms floor plan options that range from 1,051 – 1,468 square feet. Units are complete apartments with full-size kitchens and bathrooms. Each unit has high ceilings, granite countertops, stainless steel appliances, washer and dryer and other high-end upgrades available, such as

hardwood flooring. As of February 1, 2019, the occupancy rate for Independent Living is 74%.

(b) 44 Assisted Living residences ("Assisted Living"): Assisted Living has been designed to foster the continued independence of Residents who require varying amounts of assistance with the activities of daily living. Assisted Living offers equivalent finishes and amenities to the Independent Living, however they offer kitchenettes, instead of full-size kitchens. Assisted Living offers two (2) one-bedroom floorplans (451 – 511 square feet) and one (1) two-bedroom (762 square feet) floor plans. As of February 1, 2019, the occupancy rate for Assisted Living is 82%.

(c) 18 Memory Care residences ("Memory Care"): Memory Care offers secure residences for Alzheimer's and dementia patients and, along with Assisted Living, is licensed by the Texas Health and Human Services Commission. Memory Care offers studio apartments with full bathrooms and are furnished with amenities similar to Assisted Living, but without kitchenettes. Memory Care offers two (2) floor plans (330-571 square feet). As of February 1, 2019, the occupancy rate for Memory care is 94%.

(d) 41 Skilled Nursing residences ("Skilled Nursing"): Skilled Nursing offers all private rooms (approximately 330 square feet) and is Medicare certified. Due to its superior level of care, the Debtor's Skilled Nursing received the US News and World Report's Best Nursing Home Award for 2017-2018. The Debtor's skilled nursing facilities have the highest rating of five stars from the Centers for Medicare and Medicaid Services. As of February 1, 2019, the occupancy rate for Skilled Nursing is 85%.

**D.      The Resident Contracts**

**(i)      Residence Agreements**

19.      Mirador Residents are comprised of two groups: (a) Residents that are permitted to occupy a unit in the Facility for his or her lifetime (each a "Life Care Resident") through the execution of a Residence Agreement (defined below); and (b) Residents who do not execute a Residence Agreement, but enter into the Facility in Assisted Living, Memory Care, or Skilled Nursing, or are a non-Life Care Resident (each a "Direct Admit Resident").

20.      As is common practice in the CCRC industry, a Resident interested in occupying an Independent Living unit in the Facility must enter into a residency agreement (the "Residence Agreement") with Mirador.

21.     Unlike a pure rental retirement community, whereby a resident pays monthly fees for services (which fees may increase as the resident's needs change), the Residence Agreement is a life care residency contract whereby a resident will pay an entrance fee (the "Entrance Fee") and fixed monthly fees (the "Monthly Service Fees") for Mirador's commitment to provide life care services for the duration of the Resident's life, regardless of whether (a) the Resident's needs change over time, which may require additional services to be provided by Mirador; or (b) the costs of providing such services increase for Mirador. Significantly, Mirador's commitment to provide life care services continue, even if a Resident's financial condition deteriorates and he or she is unable to continue to make payments.

22.     Entrance Fees are typically split into two separate installments: (a) the Resident Deposit (defined below) and (b) the deposit balance. The first installment, the reservation deposit (the "Resident Deposit"), is generally an amount equal to ten percent (10%) of the Entrance Fee and is due when the Life Care Resident signs a reservation agreement to reserve a unit in the Facility.  The remaining ninety percent (90%) of the Entrance Fee is due when the Life Care Resident signs the Residence Agreement and the Life Care Resident's unit is available for occupancy.  In some cases, the Entrance Fee is split into three installments.  The first installment consists of the Reservation Deposit to reserve the unit.  The second installment, the deposit balance, is generally an amount equal to sixty percent (60%) of the Entrance Fee, including the Resident Deposit and is due when the Resident signs a Residence Agreement, and the Life Care Resident's unit is available for occupancy.  The third installment, the deferred entrance fee receivable, is generally an amount equal to forty percent (40%) of the Entrance Fee and is typically due within one hundred and eighty (180) days after the execution of a Residence Agreement.

23.     Historically, Mirador offered different plans for its Residence Agreements, including, but not limited to, 100%, 90%, 50% and 0% refundable contracts.  However, given the Mirador's current financial situation, only zero guarantee refundable contracts (the "Zero Guarantee Contracts") are being offered.  Depending on the Zero Guarantee Contract, Life Care Residents are entitled to a refund of ninety percent (90%) or one-hundred percent (100%) of their Entrance Fee should the Resident move-out or pass away, less between 2%-4% of their Entrance Fee per month of residence, until the Entrance Fee refund is zero percent (0%).  For a Zero Guarantee Contract, Life Care Residents pay Entrance Fees of between $150,000 to $300,000 per unit in the Facility.

24.     The Residence Agreements also require Residents to pay the Monthly Service Fees to Mirador.  In consideration for payment of the Entrance Fee, Monthly Service Fees and other fees charged by Mirador, Residents are provided with a unit and are given access to a wide array of services and amenities, as discussed above.  Specifically, section 2.5 of each Residence Agreement provides that Mirador "will provide the following services covered by the Monthly [Service] Fee and Entrance Fee," which services include: (a) dining service; (b) housekeeping and laundry; (c) utilities; (d) security and emergency alert system; (e) maintenance; (f) mail; (g) transportation; (h) social, educational and wellness programs; (i) property taxes and insurance; (j) storage area; (k) a physician to serve as a "Medical Director;" and (l) life care benefit.  Mirador uses the Entrance Fees and Monthly Service Fees to fund its operations, service its debt obligations, and make capital improvements to the Facility.  Currently, Monthly Service Fees in Independent Living range from $3,200 to $5,300.  A separate fee of approximately $830 is also assessed for the addition of a second Life Care Resident to a unit in the Facility.

25.     If, after the move-in date set forth in the Residence Agreement, (a) a Resident terminates the Residence Agreement; (b) a Resident passes away (or in the case of two Life Care Residents living in the same unit, both pass away); or (c) in rare instances Mirador terminates the Residence Agreement pursuant to the provisions thereof, then such Resident is entitled to the refundable portion of his or her Entrance Fee (the "Resident Refund") pursuant to the terms of each Resident's Residence Agreement.  A Resident Refund is due after a Resident physically and permanently leaves his or her unit, including removal of a Resident's personal property, and is made within ten (10) days of the later of (a) the effective date of termination of the Residence Agreement, or (b) the date a new Entrance Fee and executed Residence Agreement is received by the Facility and a new Resident (the "New Resident") occupies a unit.

26.     A Direct Admit Resident pays a Monthly Service Fee equal to the advertised market rate for the level of care he or she requires.  For example, a Direct Admit Resident in Assisted Living Pays the market rate for Assisted Living.

27.     Currently, the Monthly Service Fees in Assisted Living and Memory Care range from $5,200 to $6,700.  Skilled Nursing is approximately $10,800 per month.

**E.      The Debtor's Indebtedness**

28.     As of the Petition Date, on a book value basis, Mirador has approximately $53 million in assets which consists of approximately:

    a.  $340,000 in cash and cash equivalents (including $186,000 of Resident
        Deposits held in escrow);
    b.  $600,000 in accounts receivable;
    c.  $50.7 million of property plant and equipment;
    d.  $342,000 in restricted assets; and
    e.  $567,000 of other assets.

29.     As of the Petition Date, on a book value basis, Mirador has approximately $118 million of liabilities, which consists of approximately:

a. $120,000 in accounts payable;
b. $405,000 in accrued costs;
c. $554,000 in Management Fees owed to Seniority
d. $2 million of oversight fees owed to SQLC;
e. $26.3 million of resident refund obligations;
f. $74.5 million (plus accrued interest) of long-term municipal bond obligations; and
g. $13.9 million (plus accrued interest) of subordinated note obligations.

**(i)** **The Series 2010 Bonds**

30.  Pursuant to an Indenture of Trust dated as of March 1, 2010, between Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") and UMB Bank, N.A., as successor Bond Trustee (the "Bond Trustee"), the Issuer authorized and issued the Retirement Facility Revenue Bonds (Mirador Project) Series 2010A, Series 2010B-1 and Series 2010B-2 (collectively, the "Series 2010 Bonds"), in the original aggregate principal amount of $79,040,000.

31.  The Issuer loaned the proceeds of the Series 2010 Bonds to the Debtor pursuant to that certain Loan Agreement dated as of March 1, 2010 (the "2010 Loan Agreement").  The Debtor used the loan proceeds in order to finance the acquisition of the land and construction of the Facility.

32.  The proceeds of the Series 2010 Bonds were loaned to the Debtor pursuant to the 2010 Loan Agreement to: (a) pay certain costs for constructing and equipping the Facility; (b) fund debt service reserves to secure the Series 2010 Bonds; (c) fund twenty four (24) months of interest on the Series 2010 Bonds; and (d) pay the cost of issuance of the Series 2010 Bonds.

33.  To secure the payment of the Series 2010 Bonds, the Debtor and UMB Bank, N.A., as successor Master Trustee (the "Master Trustee" and, together with the Bond Trustee, the "Trustee"), entered into that certain Master Trust Indenture, Deed of Trust and Security Agreement dated as of March 1, 2010 (the "2010 Bonds Master Indenture").  Pursuant to the 2010 Bonds Master Indenture, the Debtor pledged as security for the Series 2010 Bonds, among other things,

(a) a lien on the Facility; (b) a security interest in all of its personal property; (c) a security interest in all of its Goss Revenues (as defined in the Master Indenture below), with certain exceptions; (d) a security interest in the funds and accounts established under the 2010 Bonds Master Indenture; and (e) a security interest in any other property from time to time subjected to the lien of the 2010 Bonds Master Indenture.

### (ii)   <u>The Series 2017 Bonds</u>

34.     The Debtor was unable to operate the Facility at a level to generate sufficient revenues to meet the financial covenants associated with the Series 2010 Bonds, which resulted in Events of Default (as defined under the under the 2010 Bonds Master Indenture and other documents governing the Series 2010 Bonds).  In light of the Events of Default, the Debtor, SQLC, and the Trustee, acting at the direction of the holders of a majority in principal amount of the outstanding Series 2010 Bonds, engaged in negotiations and ultimately entered into an agreement for a financial restructuring of the Series 2010 Bonds.

35.     The financial restructuring involved, among other things, (a) a mandatory exchange of the Series 2010 Bonds for Series 2017 Bonds (as defined below), (b) supplements and modifications to certain of the Series 2010 Bond documents, and (c) the execution of certain new bond financing documents.  In order to ensure that the Trustee had the requisite authority to implement the financial restructuring and bind all holders of the Series 2010 Bonds, the Trustee initiated a trust instruction proceeding ("<u>TIP</u>") in Minnesota state court pursuant to Minn. Stat. §§ 501C.0201-0208 and, on February 22, 2017, obtained an order from the court authorizing and instructing the Trustee to implement the financial restructuring.

36.     The Series 2010 Bonds were exchanged for the Issuer's Retirement Facility Revenue Bonds (SQLC Senior Living Center at Corpus Christi, Inc. - Mirador Project) Series 2017

A (the "Series 2017 Bonds") in an initial aggregate principal amount of $70,435,000 (the "Exchange"), issued pursuant that certain Indenture of Trust dated as of March 1, 2017, by and between the Issuer and the Bond Trustee.  The Issuer loaned the proceeds of the Series 2017 Bonds to the Debtor pursuant to that certain Loan Agreement dated as of March 1, 2017.  The Series 2017 Bonds are secured under the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of March 1, 2010 and effective as of March 1, 2017 (as amended and restated, the "Master Indenture"), by and between the Debtor and the Master Trustee.  The Debtor's obligation to repay the Series 2017 Bonds is evidenced by a promissory note (the "Series 2017A Note"), issued under and entitled to the benefit and security of the Master Indenture.

37.     The Series 2017 Bonds are secured under the Master Indenture by (a) a lien on and security interest in the Facility granted to the Master Trustee pursuant to the Master Indenture; (b) the Debtor's Gross Revenues; (c) all of the Debtor's personal property, and (d) the funds and accounts established under the Master Indenture.

38.     Following the Exchange, certain Events of Default have occurred and are continuing under the documents governing the Series 2017 Bonds, including, among other things, the Debtor's failure to remit to the Trustee all required monthly interest installment payments with respect to the Series 2017 Bonds.

39.     To allow the parties sufficient time to analyze and discuss a path forward, the Bond Trustee and the Debtor entered into a Forbearance Agreement, which was subsequently amended by a First Amendment to Forbearance Agreement dated as of May 8, 2018, a Second Amendment to Forbearance Agreement dated as of June 11, 2018, a Third Amendment to Forbearance Agreement dated as of July 20, 2018, a Fourth Amendment to Forbearance Agreement dated as of December 20, 2018, and Fifth Amendment to the Forbearance Agreement dated as of February 7,

2019 (as amended, the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, the Bond Trustee agreed to forbear from exercising its remedies against the Debtor as to certain continuing and anticipated defaults during this forbearance period. Furthermore, the Debtor will not make any debt service payments with respect to the Series 2017 Bonds during the forbearance period.

**(iii)   Liquidity Support Agreement**

40.    Upon the closing of the Series 2010 Bonds, the Debtor, SQLC LSA and the Indenture Trustee entered into that certain liquidity support agreement pursuant to which SQLC LSA agreed to provide liquidity support to the Debtor of up to $2,500,000 (the "2010 Liquidity Support Agreement"). The full $2,500,000 was advanced to the Debtor to pay for Facility costs, interest on the Series 2010 Bonds, and operating expenses in conjunction with the Facility.

41.    As of January 31, 2018, the accrued fees under the 2010 Liquidity Support Agreement are $2,500,000 of principal plus approximately $210,480 in associated fees.

**(iv)   SQLC Subordinated Notes**

42.    Effective as of the closing of the Series 2010 Bonds, SQLC advanced the Debtor $2,750,000 to finance the building of the Facility (the "SQLC Initial Subordinated Loan").

43.    Subsequently, in May 2013, June 2014 and November 2014, SQLC advanced additional funds to the Debtor in the cumulative amount of $3,538,832 for the Debtor's use with respect to operational expenses during the fill-up phase of the Facility and to partially fund interest payments due on the Series 2010 Bonds (the "SQLC Subsequent Subordinated Loans," and collectively with the SQLC Initial Subordinated Loan, the "SQLC Subordinated Loans"). The repayment of the obligations under each SQLC Subordinated Loan is represented by a note (each

a "SQLC Subordinated Note"), each of which is subordinate in all respects to the Series 2017

Bonds.

44.     In May 2016, before the Exchange, SQLC advanced $2,830,306.25 to the Debtor

to fund the interest due on the Series 2010 Bonds on May 15, 2016 in consideration of the Trustee's

agreement to forbear from exercising remedies against the Debtor or the Facility.  The Debtor's

obligation to repay the advance from SQLC was evidenced by that certain Series 2010C Note,

which was issued under and entitled to the benefit and security of the Series 2010 Bonds Master

Indenture and was secured *pari passu* with the Series 2010 Bonds.

45.     In connection with the Exchange, the Series 2010C Note was exchanged for a

Series 2017B promissory note of the Debtor (the "Series 2017B Note"), issued to SQLC under and

entitled to the benefit and security of the Master Indenture in a principal amount equal to the

outstanding principal amount of the Series 2010C Note, subject to adjustment for any advance of

funds by SQLC to the Debtor to pay costs associated with the implementation of the Exchange.

The Series 2017B Note is subordinated to the Series 2017 Bonds with respect to both payment and

collateral.

46.     Additionally, the Debtor and SQLC entered into that certain Loan Agreement dated

May 11, 2018 (the "2018 Liquidity Support Agreement"), pursuant to which SQLC agreed to

provide up to $500,000 in liquidity support to the Debtor during the pendency of discussions

regarding a potential financial restructuring of the Series 2017 Bonds.  The funds available under

the 2018 Liquidity Support Agreement are to be drawn to pay operating or restructuring expenses

of the Debtor under certain circumstances set forth in the 2018 Liquidity Support Agreement.  The

repayment of the obligations under the 2018 Liquidity Support Agreement is represented by a note

(the "Series 2017C Note") issued to SQLC under and entitled to the benefit and security of the

Master Indenture between the Debtor and the Trustee.  The Series 2017C Note is secured on a parity basis with the Series 2017A Note and is superior to the Series 2017A Note and the Series 2017B Note with respect to payment, unless certain events set forth in the Series 2017C Note occur, at which time the Series 2017C Note will not be entitled to any superior right of payment. To date, SQLC has not provided any funds to the Debtor under the 2018 Liquidity Support Agreement.

47.     Currently, the total outstanding amount due under the SQLC Subordinated Loans is $9,119,138 plus $2,047,271 of interest.

**F.     Events Leading to Chapter 11**

**(i)     <u>The Decline in the Market</u>**

48.     The Debtor's Entrance Fee model, as well as pricing, was based upon its successful affiliates in the Dallas, Fort Worth, and Austin, Texas markets.  The Corpus Christi market, with its smaller median income, however, was not able to sustain the level of Entrance Fees initially expected as part of the Series 2010 Bonds issuance.

49.     Additionally, the economic downturn starting in 2008 had a material adverse financial impact on the Debtor and the Facility.  The steep decline in the residential real estate market impaired the ability of some potential Residents to sell their houses and pay the requisite Entrance Fee.  The impact resulted in the delay of unit level occupancy and depressed cash flow during the early years of the Debtor's existence.

50.     The senior housing market in Corpus Christ, Texas, is also very competitive. Mirador competes with four (4) primary competitors, which are all located within a ten (10) mile radius of the Facility.

51.     Market saturation coupled with a prospective Resident population that is generally not able to afford Mirador's historical Residence Agreement cost has limited Mirador's ability to pay the obligations under its pre-petition capital structure.

52.     Despite optimism resulting from the Exchange, the market environment continued to deteriorate, and cash flows were not sufficient to fund the Series 2017 Bond debt service obligations.

**(ii)     The Debtor's Prepetition Restructuring Efforts**

53.     Before the Petition Date, the Debtor implemented a variety of initiatives, including changing its pricing strategy by reducing the cost of resident Entrance Fees to appeal to the depressed Corpus Christi market.  While the change in pricing strategy worked to fill the Facility, it also produced a negative effect on the long-term financial ability of the Debtor to pay Resident Refunds as they became due.  The Debtor's initial Life Care Residents often executed 90% refundable contracts, which resulted in a higher Resident Refund obligation.  In an effort to maintain occupancy levels, newer Life Care Residents often paid a lower cost Entrance Fee.  Thus, as earlier Residents moved out of the Facility and became eligible for Resident Refunds, the Entrance Fees received from New Residents were not sufficient to cover the Debtor's Resident Refund obligations.  This pattern continued such that as of late 2017, the Debtor owed and was unable to pay Resident Refunds of approximately $2 million.

54.     The Debtor further tried to remedy its financial shortfall by addressing operational inefficiencies.  To that end, it examined its vendor relationships to eliminate extraneous costs.  Additionally, expenses for company related travel and other administrative overhead were decreased.

55.     In late 2017, in response to its declining financial situation, the Debtor employed a consulting firm to provide a market feasibility assessment to better understand its market, evaluate its competition, and provide marketing strategy recommendations.  In response to the findings, the minimum Entrance Fee was reduced to approximately $116,000 to align with the market area. Additionally, as a result of the Debtor's financial difficulties and uncertainty about its ability to refund new Residents to the Facility, the Debtor began exclusively offering the Zero Guarantee Contracts.

56.     Before the Petition Date and as a result of discussions among the Debtor, the Trustee and the holders of a majority in principal amount of the outstanding Series 2017A Bonds (collectively, the "Indenture Trustee") and counsel for the ad hoc Mirador Residents Council (the "Residents Council"),[2] the parties agreed that the Debtor would conduct an affiliation/sale process relating to the Facility and agreed to certain milestones for that process.

57.     Since the second quarter of 2018, the Debtor pursued strategic alternatives to position its business for a sale, absent the existence of an alternative to recapitalizing the Debtor. To initiate the strategic process, the Debtor hired Robichaux and Ankura Consulting Group, LLC ("ACG") to serve as Chief Restructuring Officer ("CRO") to the Debtor to review, develop and implement strategic alternatives.  With the consent of the Indenture Trustee, the Debtor retained Cushman & Wakefield ("Cushman"), an independent third party, to market the Facility to potential affiliation partners and/or purchasers.  The Debtor's assets and business were exposed to the market for approximately five months during which numerous strategic parties were contacted and sent information relating to the Debtor's assets and business.

---

[2] Counsel for the Residents Council Committee has received a prepetition retainer in the amount of $20,000 and payments totaling $13,822.50 from the Debtor prior to the Petition Date.  In addition, fees of counsel for the Resident Committee are included in the DIP Budget.

58.     After this lengthy marketing process and substantial discussions with the Indenture Trustee and the Residents Council, the Debtor entered into an Asset Purchase Agreement dated February 8, 2019 (the "Stalking Horse APA") with Ronald E. Jennette, Trustee, as trustee of the Aldergate Trust, a Texas trust (the "Stalking Horse") and Methodist Retirement Community ("MRC"), which is an affiliate of the Stalking Horse.  In accordance with the Stalking Horse APA, the Debtor agreed to sell and the Stalking Horse agreed to buy substantially all of the Debtor's assets, including the Facility (the "Assets") Free and Clear (as defined in the Debtor's consensual plan filed contemporaneously herewith (the "Plan")) of any or all liens, claims and interests, except as otherwise set forth in the Plan, pursuant to a sale under section 363 of the Bankruptcy Code, for $20,350,000 in cash plus the assumption of certain liabilities (the "Transaction"), subject to higher and better offers through a competitive auction process (the "Bidding Process").  Pursuant to the Stalking Horse APA, the Stalking Horse shall assume all Residence Agreements, including executory Residence Agreements of former Residents (the "Executory Former Residence Agreements"), with no modification thereto and the Residents shall retain their rights under such agreements, including any right to a Resident Refund.

59.     Contemporaneously with filing of this Declaration, the Debtor filed its consensual Plan and Disclosure Statement (the "Disclosure Statement").

60.     Importantly, one of the Debtor's primary goals in its chapter 11 Case is non-impairment of the Residents under the Residence Agreements.  Accordingly, the Debtor anticipates and projects that all Resident obligations will be paid in connection with the proposed sale.

61.     Accordingly, the Debtor filed this chapter 11 Case to effectuate a sale of its assets. The filing of this Case and the confirmation of the Plan is the Debtor's best option to preserve and maximize the value of its assets and business.

## THE FIRST DAY MOTIONS

**A.     Notice of Complex Designation**

62.     The Debtor submits that this Case qualifies as a "Complex Chapter 11 Case" because:

> (a)  The Debtor has a total debt of more than $10 million;
>
> (b)  There are more than 50 parties-in-interest in this case; and
>
> (c)  The Debtor has a significant need for simplification of noticing and hearing procedures to reduce delays and expense.

**B.     Emergency Motion to Approve (A) Maintenance of Pre-Petition Bank Accounts and Cash Management System; and (B) Continued Use of Existing Checks and Business Forms (the "Cash Management Motion")[3]**

63.     In its Cash Management Motion, the Debtor requests permission to: (a) continue to use its Cash Management System (as defined below); (b) honor certain pre-petition obligations related to the use of the Cash Management System; (c) continue using debit, wire, credit card and ACH payments as warranted; and (d) maintain certain existing bank accounts and existing forms. The Cash Management System facilitates the Debtor's cash monitoring, forecasting and reporting, and enables the Debtor to maintain control over the administration of its Bank Accounts.  Without the requested relief, the Debtor would be unable to maintain its financial operations effectively and efficiently, which would cause significant harm to the Debtor's operations and its estate.

---

[3] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Cash Management Motion, which is incorporated herein by reference.

64.     Before commencing this Case, the Debtor managed its cash receivables and payables through a cash management system (the "Cash Management System") maintained by Bank of America, N.A. ("BoA"), Regions Bank ("Regions") and UMB Bank, N.A. ("UMB," and collectively with BoA and Regions, the "Cash Management Banks").  A list of the accounts in the current Cash Management System is attached to the Cash Management Motion as Exhibit C and a chart demonstrating the cash flows is attached as Exhibit D.

65.     In the Cash Management Motion, the Debtor requests authority to (a) maintain and continue to use any or all of its existing accounts in the names and with the account numbers existing immediately before the Petition Date; provided, however, that the Debtor has reserved the right to close some or all of its existing accounts and operate new debtor-in-possession accounts; (b) deposit funds in and withdraw funds from any such accounts by all usual means, including checks, wire transfers, automatic clearinghouse transfers, electronic funds transfers, or other debits; and (c) treat its existing Bank Accounts (and all accounts opened post-petition) for all purposes as debtor-in-possession accounts.

66.     The Debtor's Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtor and its estate, including, among other things, the ability to control corporate funds, ensure the maximum availability of funds when necessary, and reduce borrowing costs and administrative expenses by facilitating the movement of funds and by providing more timely and accurate account balance information.

67.     Having to replace the current Cash Management System would be costly and disruptive of the orderly collection of revenues by the Debtor, resulting in a significant adverse effect on the Debtor's operations and sale efforts.

68.     In addition, the Debtor, in the Cash Management Motion, requests that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtor to make all disbursements by check as the Debtor conducts many transactions through ACH and wire transfers and other similar methods.  If the Debtor's ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Debtor may be unable to perform under certain contracts, its business operations may be unnecessarily disrupted, and its estate may incur additional costs.

69.     The Debtor also requests that the Court authorize the Cash Management Banks to (a) continue to maintain, service, and administer the Bank Accounts as accounts of the Debtor as a debtor-in-possession, without interruption and in the ordinary course of business and only to the extent authorized by order of the Court; and (b) accept and honor all representations from the Debtor as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date and that such bank not be deemed to be liable to the Debtor or its estate on account of such pre-petition check or other item honored post-petition.

70.     As part of the Cash Management System, the Debtor utilizes numerous business forms in the ordinary course of its business.  To preserve funds and assist in the efficient administration of its estate, the Debtor has sought authority to use pre-existing business forms and check stock; provided, however, that once the Debtor's current stock of business forms has been exhausted, the Debtor will, when reordering, require the designation "Debtor-in-Possession," the corresponding case number, and all other related information required by the Guidelines.

71.     The U.S. Trustee has approved two of the Cash Management Banks, BoA and Regions, as authorized depositories and each is backed by the Federal Deposit Insurance Corporation (the "FDIC").

**C.     Emergency Motion for Interim and Final Orders (I) Authorizing Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Super-Priority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief (the "Financing Motion")[4]**

72.     In its Financing Motion, the Debtor seeks authority to obtain senior secured post-petition financing from Invesco High Yield Municipal Fund, Amundi Pioneer Asset Management, Inc., and/or their respective designees (collectively, the "DIP Lenders").  In addition, the Debtor will provide adequate protection to the pre-petition Indenture Trustee for any Diminution in Value of the value of its interest in the Pre-Petition Collateral.  Specifically, the Debtor seeks to:

(a)     Obtain the DIP Financing with super-priority claims and first priority priming liens senior to any pre-petition or post-petition liens on the Debtor's assets, in the form of a private placement note purchase transaction in an aggregate amount up to $2,000,000.00 (the "DIP Facility") from the DIP Lenders, pursuant to the terms and conditions of the DIP Loan Documents, the Interim Order, and the Final Order;

(b)     Borrow, during the Interim Period, pursuant to the DIP Loan Documents, the Interim DIP Loan of up to $500,000, and seek other financial accommodations from the DIP Lenders pursuant to the DIP Loan Documents and the Interim Order;

(c)     Borrow, on a final basis, pursuant to the DIP Loan Documents, the Final DIP Loan of up to an additional $1,500,000, for a total of up to $2,000,000 (*i.e.*, the DIP Loan), and seek other financial accommodations from the DIP Lenders pursuant to the Note Purchase Agreement, the other DIP Loan Documents, and the Final Order;

(d)     Execute and deliver the Note Purchase Agreement and the other DIP Loan Documents;

---

[4] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Financing Motion, which is incorporated herein by reference.

(e)    Grant the DIP Lenders allowed super-priority administrative expense claims in this Case, pursuant to section 364(c)(1) of the Bankruptcy Code, for the DIP Financing and the DIP Obligations, subject only to the Carve Out;

(f)    Grant the DIP Lenders automatically perfected first priority senior security interests in and liens on all of the DIP Collateral pursuant to section 364(d)(1) of the Bankruptcy Code, which liens shall not be subordinate to any other liens, charges, security interests or surcharges under section 506(c) or any other section of the Bankruptcy Code, with the exception of the Carve Out;

(g)    Obtain authorization to use the proceeds of the DIP Financing in accordance with the proposed initial agreed budget covering the DIP Budget;

(h)    Provide adequate protection to the Indenture Trustee pursuant to the terms of the Interim Order and the Final Order for any Diminution in Value of its interests in the Pre-Petition Collateral resulting from the DIP Liens on the Pre-Petition Collateral, subordinate to the Carve Out, the Debtor's use of Cash Collateral, and other decline in value arising out of the automatic stay or the Debtor's use, sale, depreciation, or disposition of the Pre-Petition Collateral;

(i)    Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Loan Documents, the Interim Order, and the Final Order;

(j)    Schedule a final hearing (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Financing Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(k)    Waive any applicable stay as provided in the Bankruptcy Rules and provide for immediate effectiveness of the Interim Order.

73.    The Debtor has an immediate need to use the Indenture Trustee's Cash Collateral to continue the operation of its business.  Without such funds, the Debtor will not be able to pay costs and expenses, including but not limited to wages, salaries, rent, professional fees, general and administrative operating expenses, lease operating expenses, and maintenance costs that arise in administration of this Case and in the ordinary course of the Debtor's business.

74.     The Debtor is without sufficient funds, other than the Cash Collateral, to continue operations until a Final Hearing and approval of the Final DIP Loan.  Failure to obtain interim approval of the Interim DIP Loan and DIP Facility, which is necessary to pay timely the Debtor's ongoing costs and expenses, will result in immediate and irreparable harm to the Debtor, its estate, and its Residents' safety and comfort.  The request for interim authorization seeks only that amount of Cash Collateral necessary to avoid immediate and irreparable harm to the Debtor's assets pending a Final Hearing.

75.     Absent the ability to use the Cash Collateral, the Debtor will be forced to shut down its operations abruptly, which will negatively impact the value of its assets and reduce or eliminate any prospect for a successful reorganization and confirmation of the Debtor's Plan.  An abrupt shutdown will result in a severe and dramatic loss of value in the Debtor's assets and business. Accordingly, the Debtor requests authority to (a) use the Cash Collateral on an interim basis in accordance with the proposed interim budget and interim order attached to the Cash Collateral motion; (b) use the Cash Collateral on a final basis; and (c) provide adequate protection to the Indenture Trustee in accordance with the negotiated terms.

76.     To protect the Indenture Trustee's interest in the Cash Collateral, the interim order proposes to grant the Indenture Trustee adequate protection in the form of valid and perfected additional and replacement security interests and liens and a super priority administrative expense claim to the extent of any diminution of value in its collateral, subject to the terms and conditions of the proposed Interim Order.  The Interim Order also authorizes the Debtor to use the proceeds of the DIP Financing in accordance with the proposed initial agreed budget covering the initial 13-week period and subsequent periods (the "DIP Budget"), attached as Exhibit B.

**D.** **Emergency Motion for (a) Entry of an Order Approving (1) the Asset Purchase Agreement and Authorizing the Debtor to Enter into the Asset Purchase Agreement and comply with its Obligations Thereunder; (2) Related Bid Protections; (3) the Procedures for the Solicitation of Higher and Better Offers; (4) the Form and Manner of Notice; (5) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (B) Entry of an Order Approving (1) the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (2) the Assumption and Assignment of Certain Contracts and Unexpired Leases (the "Bid Procedures Motion")[5]**

77.     As discussed above, the Debtor entered into the Stalking Horse APA with the Stalking Horse, subject to higher and better offers through a competitive auction process.  The Bid Procedures Motion, which affords parties more than the standard 21-day notice period for a proposed sale and more than 40 days to submit bids, seeks an order approving the Stalking Horse APA and the bidding procedures for the sale of the Debtor's property, scheduling a bidding deadline, an auction date and a sale hearing date, and approving the form of notice in connection with the sale, including the assignment of executory contracts and unexpired leases and procedures for determining cure amounts in connection with their assumption and/or assignment.

78.     The proposed bid procedures (the "Bid Procedures"), attached as Exhibit A to the Bid Procedures Motion, are designed to maximize the value for the Debtor's estate by ensuring that a marketing and sales process is undertaken by the Debtor in accordance with the timeline required by the Stalking Horse.  The Bid Procedures are the result of good faith, arm's-length negotiations between the Debtor, the Stalking Horse and the Indenture Trustee.  To preserve the Debtor's going-concern value, the Debtor seeks to proceed with the transactions contemplated by the Stalking Horse APA as expeditiously as possible.

---

[5] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Bid Procedures Motion, which is incorporated herein by reference.

79.     The Bid Procedures facilitate a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, taking into account the financial constraints facing the Debtor and the marketing efforts undertaken before the Petition Date.  At the same time, the Bid Procedures provide the Debtor with the opportunity to consider all competing offers and to select the highest or best offer for the completion of the sale.

80.     Approval of the Stalking Horse APA ensures fair value by setting $20,350,000 in cash plus the assumption of certain liabilities as a minimum purchase price that is acceptable to both the Debtor and the Indenture Trustee, and exposing such bid to testing by the marketplace. Accordingly, the Debtor and all parties in interest can be assured that, taking into account the financial condition of the Debtor, the consideration ultimately paid for the assets to be sold will be fair, reasonable, and in the best interest of the Debtor's estate and creditors.

81.     Although the Debtor has determined, in its reasonable business judgment, that the property to be acquired should be subject to auction, the Debtor's ability to maximize value to its estate and creditors through such auction may be impaired absent approval of the Stalking Horse APA and the Bid Procedures.  As a result, the Debtor also requests authority to pay the Stalking Horse a break-up fee in the amount of $750,000 as an administrative expense (inclusive of any expenses) if the conditions set forth in the Stalking Horse APA for payment of such break-up fee are satisfied.

**E.**    **Emergency Motion for an Order (a) Authorizing (1) Payment of Pre-Petition Employee Wages, Salaries, and Payroll Taxes, (2) Reimbursement of Employees for Pre-Petition Business Expenses, and (b) Honoring of Existing Benefit Plans and Policies at the Debtor's Discretion in the Ordinary Course of Business (the "Wage Motion")**[6]

82.    As more fully detailed in the Wage Motion, the Debtor's workforce consists of 183 employees.  In the Wage Motion, the Debtor seeks Court authority to: (a) pay any and all pre-petition wages due to the Debtor's Employees and Contractors (as defined below) for work performed pre-petition, whether accrued or currently due and payable (collectively, the "Compensation Obligations"); (b) honor any and all of the Debtor's pre-petition Employee Benefit Obligations (the "Benefit Obligations"), including but not limited to, insurance payments, 401(k) matches, cell phone plans, credit cards, and any benefit premiums incurred in connection with these Benefit Obligations; (c) continue paying the Compensation Obligations, Benefit Obligations, Employee Reimbursement Obligations, Payroll Tax Obligations, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators and governmental authorities (collectively, the "Employee Obligations"); and (d) continue administering all of the Employee Obligations in the ordinary course of business, at its discretion.  The Debtor further seeks an order directing all Cash Management Banks to receive, process, honor, and pay any and all checks, electronic fund transfers, and automatic payroll transfers drawn on the Debtor's disbursement accounts (collectively, the "Disbursement Accounts"), whether such checks were presented or fund transfer requests were submitted before or after the Petition Date, to the extent that such checks or transfers related to any of the Employee Obligations.

---

[6] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Wage Motion, which is incorporated herein by reference.

83.     The Debtor seeks to minimize the personal hardship upon its Employees if they are not paid when due and seeks to maintain the morale of its essential workforce at this critical time. The Debtor will have sufficient funds to pay all requested amounts as and when due, assuming it ia granted authority to use cash collateral.[7]   All payments made on account of the Employee Obligations and programs will be made in accordance with any budget approved by this Court with respect to the use of cash collateral.

84.     In the ordinary course of business, the Debtor outsources its payroll and related functions to Aureon HR, Inc. ("Aureon") pursuant to the Client Service Agreement dated February 6, 2018 (the "Agreement").

85.     The Debtor, through Aureon, ordinarily pays Employees bi-weekly.  The amount of the bi-weekly payroll for the Debtor fluctuates each pay period, and the most recent payroll was approximately $197,825.32.

86.     The Employees were most recently paid on February 1, 2019.  February 15, 2019, is the next pay-date for the Debtor and the Debtor has funded this payroll by depositing funds with Aureon before the Petition Date.

87.     The Payroll Tax Obligations for the most recent pay period was $18,106.25.

88.     The Debtor provides a 401(k) matching contribution program and other employee benefits to its Employees through Aureon (the "401(k) Program").

89.     Additionally, the Debtor provides various vacation and insurance benefits to its Employees.

---

[7] Contemporaneously with the filing of the Wage Motion, the Debtor has sought authority to use cash collateral.

90.     The Debtor, in the ordinary course of business, reimburse Employees for a variety of expenses, which include, among other things, business-related travel and business-related expenses.

91.     The Debtor has historically maintained ten (10) company credit cards with Bank of America with a $30,000.00 combined spending limit (the "BoA Credit Cards").  The BoA Credit Cards are used for routine business charges such as fuel and Resident activities.  Although charges may fluctuate from month to month, the Debtor expends approximately $8,650 per month to pay off the charges made to the BoA Credit Cards.  As of the Petition Date, the Debtor is current for charges that have been incurred but either not yet billed, or billed, but not yet paid.

92.     Further, BoA shut off the Credit Cards on February 7, 2019, because the Debtor did not comply with BoA's demand that Mirador keep a $30,000 deposit with BoA in order to continue using the BoA Credit Cards.  Because Mirador no longer has access to the BoA Credit Cards and corresponding line of credit, Mirador purchased three (3) Pre-Paid Visa Cards with a balance of approximately $500 per card to pay post-petition obligations as part of a contemporaneous exchange of value in the Debtor's ordinary course of business.  For the avoidance of doubt, the Pre-Paid Visa Cards will not be used to pay any pre-petition debts or obligations.

93.     The Debtor also seeks to pay inventive payments to three (3) low-level Employees totaling $7,623.40 that accrued in 2018.  These inventive payments are made in the ordinary course of the Debtor's business and are based on the Employees' achievement of several milestones, including Resident satisfaction and overall performance.  Additionally, the Debtor seeks to pay the Executive Director, who is an employee of Seniority, an incentive payment of $21,024 that accrued during 2018.  These incentive payments are paid by Mirador to Aureon in Mirador's ordinary

course of business and is consistent with its monthly payroll reimbursement practices. Then, Aureon pays the incentive payments to the Employees and Executive Director

94.     The Debtor's Employees are central to its operation. A significant deterioration in employee morale at this critical time undoubtedly would have a devastating impact on the Debtor, its Residents and vendors, the value of the Debtor's assets and business, and the ability to continue operations. The total amount sought to be paid herein is relatively modest compared with the size of the Debtor's overall business and the importance of the Employees.

**F.    Emergency Motion to Authorize (a) Liability, Property, and Other Insurance Programs, (b) Payment of All Obligations in Respect Thereof, and (c) the Ability to Enter Into Premium Financing Agreements in the Ordinary Course of Business**[8]

95.     In the Insurance Motion, the Debtor seeks authority to (a) continue various Insurance Policies uninterrupted, in the ordinary course of business; and (b) enter into Premium Financing Agreements in the ordinary course of business.

96.     In connection with the operation of its business, the Debtor obtains its business and property insurance as an allocation from SQLC's Master Policy. Instead of paying the entire insurance premium related to the Master Policy in a lump sum, SQLC has entered into a Premium Financing Agreement, which allows it to pay its annual premium in monthly installments. The Debtor's annual contribution to the Master Policy's premium, including the property premium and a deductible buy-down premium, is $95,282.52, or $7,940.21 per month.

97.     The nature of the Debtor's business makes it essential to maintain its Insurance Programs on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles, or related fees under any of the Insurance Programs could result in the insurance companies

---

[8] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Insurance Motion, which is incorporated herein by reference.

terminating existing policies, declining to renew insurance policies or refusing to enter into new insurance agreements in the future.

**G.** **Emergency Motion for Interim and Final Orders (a) Authorizing Adequate Assurance of Payments to Utilities; (b) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services; and (c) Establishing Procedures for Resolving Requests for Additional Assurance of Payment (the "Utilities Motion")[9]**

98.     In the Utilities Motion, the Debtor requests authority to make adequate assurance payments to utility companies currently providing or that will provide services to the Debtor (the "Utility Companies"), prohibiting the Utility Companies from altering, refusing, or discontinuing services to the Debtor on account of the bankruptcy filing or the non-payment of pre-petition amounts owed and establishing certain procedures for resolving utility company requests for additional assurance of payment.

99.     A list of the Debtor's Utility Companies is attached as Exhibit B to the Utility Motion.  The Debtor has been current on all utility bills since its inception.  As of the Petition Date, no defaults or arrearages with any Utility Company exist and no outstanding amounts are owed to any Utility Company.  On average, the Debtor's current aggregate monthly utility usage is approximately $40,504.

100.     Uninterrupted utility services are critical to the Debtor's ability to operate, provide services to its Residents, maintain the value of its business and to maximize value for the benefit of its creditors.  The Debtor has proposed adequate assurance of payment to each identified Utility Company.  In most cases, payment of additional amounts above the proposed Adequate Assurance is unnecessary.  The Debtor has a good payment history with all of the Utility Companies and has a long history of timely payment to these entities.

---

[9] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Utilities Motion and incorporated herein by reference.

101.    I anticipate that the cash flow from operations, cash on hand, and the assets described in this Declaration will be sufficient to pay all post-petition obligations to the Utility Companies.

**H.    Emergency Motion for Order Authorizing the Debtor to Pay Pre-petition Sales, Use, and Other Taxes And Related Obligations (the "Tax Motion")**[10]

102.    By the Tax Motion, the Debtor seeks (a) authority, but not direction, to pay pre-petition taxes, including, but not limited to, sales and use taxes (the "Sales and Use Taxes"), employment withholding, payroll and unemployment taxes (the "Employment Taxes"), and all other applicable taxes (together with any applicable Sales and Use Taxes and Employment Taxes, the "Taxes") to the respective taxing authorities (collectively, the "Taxing Authorities") listed on Exhibit B of the Tax Motion; (b) authority to pay any pre-petition Taxes for which the applicable payment was remitted, but had not cleared the Debtor's bank accounts as of the Petition Date; and (c) authorization for the Debtor's banks to receive, honor, process and pay any and all checks drawn, or electronic fund transfers requested relating to the Taxes.

103.    The relief is being requested as certain taxes may constitute "trust fund" taxes and thus are not property of the Debtor's estate, and the failure to pay certain taxes could result in a lien being placed on the Debtor's property and/or such taxes constitute priority claims.  The failure to pay the Taxes could disrupt the Debtor's operations devalue its assets and impair its successful sale efforts.

104.    To my knowledge, the Debtor has sufficient liquidity to pay such amounts as they become due in the ordinary course of business.  The relief sought in the Tax Motion is necessary

---

[10] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Tax Motion, which is incorporated herein by reference.

to the continued operation of the Debtor's businesses and to preserve the value of the Debtor's estate.

**I.      Emergency Motion Under 11 U.S.C. § 333 to Excuse the Appointment of a Patient Care Ombudsman (the "Ombudsman Motion")**[11]

105.    In the Ombudsman Motion, the Debtor requests that the Court excuse the appointment of a patient care ombudsman (the "Ombudsman") as set forth in section 333(a)(1) of the Bankruptcy Code.

106.    The appointment of an Ombudsman should be excused in this Case because, among other reasons: (a) the efforts of the Ombudsman would be duplicative of those of the Residents Council that is represented by its own, independent counsel; (b) this Case was not filed for reasons relating to patient care or privacy concerns; (c) the Debtor maintains an impeccable history of patient care, with no compliance or regulatory issues; (d) the Residence Agreements are being assumed by the Purchaser without modification; (e) the Debtor's current Plan has a confirmation deadline that is less than seventy-five (75) days from the Petition Date; and (f) the Debtor has obtained sufficient post-petition financing to continue operating and providing the same high level of care to its Residents, as it has since its inception.

**J.      Application to Approve Agreement with Epiq and Appoint Epiq as Claims, Noticing, Soliciting, and Balloting Agent (the "Section 156(c) Application")**[12]

107.    In its Section 156(c) Application, the Debtor requests the entry of an order approving the appointment of Epiq as the Claims, Noticing, Soliciting and Balloting Agent for the Debtor.  If approved, Epiq will assume full responsibility for, among other things, the distribution

---

[11] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Ombudsman Motion, which is incorporated herein by reference.

[12] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Section 156(c) Application, which is incorporated herein by reference.

of filings and notices, solicitation and balloting regarding any chapter 11 plan and disclosure statement filed in this Case.

108.    Based on all engagement proposals obtained and reviewed, Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.  The terms of Epiq's retention are set forth in the Engagement Agreement attached as Exhibit C to the Section 156(c) Application.

**K.      Emergency Motion to Establish Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Motion")[13]**

109.    In the Bar Date Motion, the Debtor seeks a Court Order setting the Claims Bar Date, the Governmental Bar Date, as well as other Bar Dates.  The Debtor's proposed Bar Dates comply with all Bankruptcy Rules and will allow the Debtor to effectively and efficiently administer its estate for the benefit of all creditors and interest holders.

110.    Setting a Claims Bar Date is important in this Case.  The Debtor intends to hold an auction for the sale of the Debtor's assets and/or equity interests as soon as possible after the Petition Date.  Thus, setting a Claims Bar Date will allow the Debtor to quickly and efficiently identify liabilities of the estate, while meeting the requirements of Bankruptcy Rule 2002 to give creditors and interest holders an opportunity to file their Proofs of Claims and protect their interests, as appropriate.

**L.      Emergency Motion for Entry of an Order Authorizing the Debtor to (a) Maintain, Administer and Modify Medical Payment Refund Programs and Practice; and (b) Honor Obligations Related Thereto (the "Overpayment Refund Motion")[14]**

---

[13] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Bar Date Motion, which is incorporated herein by reference.

[14] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Overpayment Refund Motion, which is incorporated herein by reference.

111.    In the Overpayment Refund Motion, the Debtor seeks authority to continue to operate its Medical Payment Refund Program in the ordinary course of business, regardless of whether such overpayments were received pre- or post-petition.  As detailed in the Overpayment Refund Motion, such relief is warranted under section 105 and 363 of the Bankruptcy Code as a valid use of the Debtor's business judgment.

112.    Specifically, as part of the Medical Payment Refund Program, the Debtor maintains a balance account for each Resident and tracks the account in the Debtor's Resident ledger, including any Medical Refunds due back to such Resident, after all charges and payments have been reconciled.  Amounts due to Residents are recorded as a refund liability in the Debtor's general ledger.  The Debtor reviews accounts that have credit balances and either issues a credit to the Resident or Third-Party Payor's account, or, as appropriate, a check to the obligee to cover the Medical Refund.

**M.      Motion for Order Excusing Certain Residents from Filing Proofs of Claim with Respect to Entrance Fees (the "Resident Claim Requirement Waiver Motion")**

113.    In the Resident Claim Requirement Waiver Motion, the Debtor seeks an order from the Court excusing Residents from being required to file proofs of claim, if such proofs of claim only relate to the Residents' Entrance Fees.

114.    Such relief is warranted because the Stalking Horse, or any other Successful Bidder, is assuming the Residence Agreements in full, and thus the Resident Refunds will be paid in full, as and when they come due according to the Residence Agreement.

**N.      Emergency Motion for an Order Authorizing the Debtor to (I) Escrow Post-Petition Entrance Fees and (II) Refund Certain Entrance Fees (the "Escrow Motion")[15]**

---

[15] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Escrow Motion, which is incorporated herein by reference.

115.    In the Escrow Motion, the Debtor seeks authorization to (a) deposit all Entrance Fees collected post-petition in connection with Residence Agreements into a newly established Escrow Account; (b) designate an Escrow Agent; (c) amend the new Residence Agreements with an addendum providing that New Residents are entitled to refunds of their respective Entrance Fees during the pendency of this Case, if, before consummation of the Plan, (1) the New Resident elects to leave the Facility or such Resident passes away and (2) such New Resident is otherwise entitled to a refund of all or a portion of his or her Entrance Fee; (d) permit the Escrow Agent to refund Entrance Fees held in the Escrow Account to the respective New Resident or beneficiaries upon a Refund Event; and (e) require the Escrow Agent to pay the Entrance Fees upon a Trigger Event.

116.    The Debtor submits that the requested relief is necessary because Entrance Fees required under the Residence Agreements are the lifeblood of the Debtor's operations.  Entrance Fees account for a significant portion of the Debtor's annual operating budget and the collection of such amounts is critical to the Debtor's ability to reorganize, including its ability to continue as a going-concern.  Providing the relief requested in this Motion maintains the status-quo pending a resolution of this Case.

117.    Upon confirmation of the Plan or a disposition of all or substantially all of the Debtor's assets, the Escrow Agent will disburse the Entrance Fees to the Debtor pursuant to further order of this Court.  Moreover, upon a Refund Event, the Entrance Fees will be returned from the Escrow Account to the New Resident who made such payments.  Any restriction preventing the Debtor from guaranteeing prospective Residents that their Entrance Fees will be escrowed would have a devastating effect on the Debtor's operations.  Accordingly, the Debtor seeks authorization

to escrow all Entrance Fees received post-petition in order to protect the New Residents' interest with respect thereto.

118.    The requested relief is necessary to provide assurance to New Residents that the Debtor's bankruptcy Case will not affect such New Residents' right to a refund.  Any negative publicity suggesting that the Debtor is in bankruptcy will necessarily deter prospective Residents from entering into new Residence Agreements, which are the precursors to the Debtor's receipt of future Entrance Fees.

**O.      Emergency Motion to (A) Implement Certain Notice Procedures; and (B) Implement Procedures to Maintain and Protect Resident Information (the "Notice Procedures Motion")[16]**

119.    In the Notice Procedures Motion, the Debtor requests that the Court (a) approve the proposed notice procedures described in the Notice Procedures Motion; and (b) authorize the implementation of procedures to protect confidential information of the Debtor's Residents as required by HIPAA.

120.    Specifically, in the ordinary course of operating the Facility and providing care for its Residents, HIPAA requires that the Debtor maintain the confidentiality of certain information. However, the Debtor recognizes that such requirements may conflict with its duty to disclose certain information under the Bankruptcy Code, including, without limitation, the duty to file a list of creditors under section 521(a)(1)(A) and a list of schedules of assets and liabilities under section 521(a)(1)(B)(i).    Accordingly, the Debtor seeks authorization to implement the Resident Confidentiality Procedures.

---

[16] All capitalized terms used in this Section not expressly defined in this Declaration shall have the same meaning as ascribed in the Notice Procedures Motion, which is incorporated herein by reference.

## **<u>CONCLUSION</u>**

121.    Approval of the First Day Motions is in the best interest of the Debtor, its estate and its creditors.

122.    I have reviewed this Declaration and hereby declare under penalty of perjury that the foregoing is true and correct and within my own personal knowledge.

Executed this _8_____ day of February, 2019.

_____
Louis E. Robichaux IV
Chief Restructuring Officer
SQLC Senior Living Center at Corpus
Christi, Inc. d/b/a Mirador